UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

ANGELA WEISGARBER,                    )
on behalf of N.C.B., a minor,         )
                                      )
            Plaintiff,                )
                                      )
v.                                    )        No.:   3:16-CV-100-TAV-CCS
                                      )
NANCY A. BERRYHILL,[1]                )
Acting Commissioner of Social Security,  )
                                      )
            Defendant.                )

## MEMORANDUM OPINION

This case is before the Court on plaintiff's Motion for Summary Judgment and

Memorandum in Support [Docs. 23, 24] and defendant's Motion for Summary Judgment

and Memorandum in Support [Docs. 28, 29].  Angela Weisgarber, on behalf of her minor

nephew, N.C.B. ("plaintiff"), seeks judicial review of the decision of the Administrative

Law Judge ("ALJ"), which is the final decision of defendant Nancy A. Berryhill, Acting

Commissioner of Social Security ("Commissioner").  For the reasons that follow, the Court

will grant the Commissioner's motion and deny plaintiff's motion.

## I.     Procedural History

This case is before the Court for a second time.  Plaintiff originally filed an

application for supplemental security income ("SSI") under Title XVI of the Social

---

[1]  During the pendency of this case, Nancy A. Berryhill replaced Acting Commissioner
Carolyn W. Colvin.  Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is
substituted as the defendant in this case.

Security Act on July 22, 2010, alleging a period of disability that began on April 1, 2008 [Tr. 107]. After the application was repeatedly denied at the administrative level, plaintiff filed a complaint with this Court [Tr. 678]. On July 3, 2014, the Court granted plaintiff's motion for summary judgment and remanded the case back to the agency for further consideration [Tr. 676–711].

To comply with the directives set forth in the Court's Order of remand, the agency's Appeals Council remanded the case to the ALJ, instructing the ALJ to offer plaintiff a second hearing, take any necessary action to complete the administrative record, and issue a new decision [Tr. 712–14]. The ALJ held a hearing on May 26, 2015 [Tr. 637–49]. Plaintiff's counsel requested a closed period[2] of disability from July 16, 2010, through September 17, 2013 [Tr. 831]. On October 26, 2015, the ALJ found that plaintiff was not "disabled" [Tr. 614–30]. Plaintiff did not make a timely request for review to the Appeals Council [Tr. 608–09], thereby making the ALJ's decision the final decision of the Commissioner.

Having exhausted his administrative remedies, plaintiff filed the instant Complaint with the Court on February 26, 2016, seeking judicial review of the Commissioner's final decision under Section 405(g) of the Social Security Act [Doc. 1]. The parties have filed competing motions for summary judgment, and this matter is now ripe for adjudication.

---

[2] "In a closed-period case, the ALJ 'determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of [the ALJ's] decision.'" *Newbold v. Colvin*, 718 F.3d 1257, 1260 n.1 (10th Cir. 2013) (quoting *Shepherd v. Apfel*, 184 F.3d 1196, 1199 n. 2 (10th Cir. 1999)).

## II.    Standard of Review

When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining: (1) whether the ALJ's decision was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner, and (2) whether the ALJ's findings are supported by substantial evidence. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) (citation omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted). It is immaterial whether the record may also include substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The substantial evidence standard is intended to create a "'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, the Court will not "try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citation omitted). On

review, plaintiff "bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y. of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994) (citation omitted).

## III. Analysis

Plaintiff herein is a child under the age of eighteen. Ms. Weisgarber, who is plaintiff's aunt, seeks SSI benefits on behalf of plaintiff. To qualify for SSI benefits as a child, a child must be under the age of eighteen and prove that he or she has a "medically determinable physical or mental impairment, which results in marked or severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

A child's disability claim is assessed pursuant to a three-step sequential evaluation. 20 C.F.R. § 416.924(a). At step one, the child must not be engaged in "substantial gainful activity." *Id.* At step two, the child must "have an impairment or combination of impairments that is severe." *Id.* At step three, the child's impairment or combination of impairments must "meet," "medically equal," or "functionally equal" one of the medical listings found in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* § 416.924(a)–(d).

A child "meets" a medical listing when his or her impairment satisfies all of the criteria of a particular listing. *Id.* § 416.925(c)(3). To "medically equal" a listing, a child's impairment must be "medically equivalent to a listed impairment." *Id.* § 416.926(a). That is, the child's impairment or combination of impairments is of "equal medical significance to the required criteria." *Id.* § 416.926(b)(1)(ii). To "functionally equal" a listing, the child's impairment "must be of listing-level severity." *Id.* § 416.926a(a). "Listing-level

severity" means that the child has either two "marked" limitations or one "extreme" limitation in one of the following six domains of functioning: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for himself, or (6) health and physical well-being. *Id.* § 416.926a(b)(1). "These domains are broad areas of functioning intended to capture all of what a child can or cannot do." *Id.*

Turning to the instant case, plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, plaintiff asserts that the ALJ erred in finding that plaintiff did not meet or medically equal Listing 112.03 [Doc. 24 pp. 19–23]. Plaintiff further maintains that the ALJ erred in finding that plaintiff did not have an impairment that functionally equaled a listing [*Id.* at 24–31]. Lastly, plaintiff submits that the ALJ improperly weighed the opinion evidence of record by giving greater weight to the opinions of non-examining state agency medical consultants and "other sources" than the opinions of plaintiff's treating sources, Gordon Greeson, M.D., and Angela Reno, Psy., D. [*Id.* at 31–35]. The Court will address plaintiff's allegations of error in turn.

## A. Listing 112.03

Plaintiff asserts that the ALJ ignored favorable evidence and provided a "bare conclusion," with little analysis, that plaintiff did not meet or medically equal Listing 112.03. [*Id.* at 19–23].

Listing 112.03 deals with schizophrenic, delusional (paranoid), schizoaffective, and other psychotic disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 112.03. To meet or

medically equal the listing, a claimant must satisfy the requirements of paragraphs A and B. *Id.* In the disability decision, the ALJ found there was evidence that plaintiff had hallucinations as required by paragraph A, but he did not satisfy paragraph B [Tr. 619]. Paragraph B of Listing 112.03 requires at least two of the following:

> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

> d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 112.03(B).

In concluding that plaintiff did not satisfy the paragraph B criteria, the ALJ found that plaintiff's written expression learning disorder and psychotic disorder, both found to be a severe impairment at step 2, did not cause a marked impairment [Tr. 619]. With regard

to subparagraph (a), cognitive/communicative functioning, the ALJ cited to an August 2010, questionnaire completed by plaintiff's speech therapist, Pamela Allen, M.A., CCC-SLP, who opined that plaintiff could communicate effectively and express thoughts and ideas in an age-appropriate manner with only occasional difficulty organizing his thoughts through writing [Tr. 147–48, 619].  As to the remaining criteria required by paragraph B, the ALJ observed that treatment notes "previously discussed" in the ALJ's decision generally indicated that plaintiff made good grades, had friends at school, and did not exhibit behavior problems at school [Tr. 618–19].  The ALJ referenced a treatment note from October 2010, which documented that plaintiff's grades were improving, and while he had behavioral problems at home, he did not have any at school [Tr. 462, 618].  By January 2011, it was noted that plaintiff experienced significant improvement with medication [Tr. 601, 618].  Plaintiff continued to make progress throughout the remainder of the closed period.  Treatment records document that plaintiff was doing well, getting good grades, and had friends [Tr. 618, 877, 890, 892, 912, 921, 925–28, 931].  Additionally, the ALJ cited to an August 2010, questionnaire completed by plaintiff's third-grade teacher, Rhonda Phillips, who opined that plaintiff did not have problems getting along with others or caring for himself [Tr. 154–55, 156, 619].

In light of these considerations, the Court finds that the ALJ provided more than a "bare conclusion" that plaintiff did not meet or medically equal Listing 112.03.  The ALJ provided a reasoned and thorough explanation—with citations to specific medical and non-medical evidence—as to why plaintiff did not satisfy the requisite marked impairments

under paragraph B.  Contrary to plaintiff's assertion, the ALJ's discussion of Listing 112.03 and citation to specific record evidence demonstrates how the ALJ reached her conclusion, thereby permitting meaningful judicial review by this Court.  *Cf. Woodall v. Colvin*, No. 5:12-CV-1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013) ("While the ALJ stated that he considered all of the Listings, particularly those in section 112.00, the ALJ failed to discuss those Listings and failed to compare them with the evidence of record to show how he determined that Claimant's impairments did not meet or medically equal any of the Listings.").

Plaintiff asserts that the ALJ "only provided vague references to portions of the record indicating periods of improvement and/or stability, without mentioning the ample records supporting evidence of ongoing hallucinations during the closed end period" [Doc. 24 p. 24].  To the extent that plaintiff's complaint of "vague references" is in response to the ALJ's citation to "previously discussed" treatment notes, the Court observes that the Sixth Circuit Court of Appeals has implicitly endorsed the practice of looking at the entirety of the ALJ's decision for statements and cited reasons as to why a claimant's impairment does not satisfy a listing.  *See Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding that "[t]he ALJ did not err by not spelling out every consideration that went into the step three determination" because "[t]he ALJ described evidence pertaining to all impairments, both severe and non-severe . . . five pages earlier in his opinion and made factual findings").

Here, the ALJ's discussion of Listing 112.03 specifically references treatment notes that the ALJ discussed one page earlier in the decision, in which citation was made to treatment notes that document reports of plaintiff making good grades, exhibiting no behavioral problems at school, and having friends. The ALJ was not required to discuss this evidence in detail a second time simply because it was relied on in a different portion of the ALJ's decision. *See id.*

Moreover, "the ample records" plaintiff contends support a finding that he meets or medically equals Listing 112.03 pre-dates the closed period of July 16, 2010, through September 17, 2013 [*See* Doc. 24 pp. 20–23]. "The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date." *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Nonetheless, the ALJ's decision explicitly considered the pre-dated evidence cited by plaintiff, including treatment records from Youth Villages, Peninsula Hospital, and treatment notes from Dr. Reno and Dr. Greeson [Tr. 617–18, 621–22]. The only evidence cited by plaintiff that occurred during the close period is hearing testimony provided by Ms. Weisgarber, which occurred during the first administrative hearing on November 15, 2011, and a treatment note from Dr. Greeson dated May 16, 2012, in which plaintiff reported experiencing some auditory hallucinations and was irritated by voices [Doc. 24 p. 23]. This evidence, however, is insufficient to undermine the ALJ's decision and alone does not satisfy the criteria for Listing 112.03. *See Boyes*, 46 F.3d at 512 ("Claimant bears the burden of proving his entitlement to benefits." (citation omitted)).

Accordingly, the Court finds that the ALJ's discussion of Listing 112.03 is supported by substantial evidence, and plaintiff's arguments to the contrary are not well-taken.

## B.     Functional Equivalence

Plaintiff further maintains that the ALJ's functional equivalence determination is not supported by substantial evidence. The ALJ concluded that plaintiff had less than marked limitations in all six domains of functioning [Tr. 624–29]. Plaintiff challenges the ALJ's finding with regard to the domains of (1) interacting and relating to others, and (2) caring for himself [Doc. 24 pp. 24–31].

To reiterate, a claimant must either have "marked" limitations in at least two of the six functional domains or an "extreme" limitation in one of the six functional domains to functionally equal a listed impairment. 20 C.F.R. § 416.926a(b)(1). A "marked" limitation occurs when the child's impairment seriously interferes with his ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). An "extreme" limitation occurs when the child's impairment interferes very seriously with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i).

### 1.     Interacting and Relating to Others

Plaintiff complains that the ALJ discussed selective information from the record in concluding that plaintiff did not have marked limitations in interacting and relating to others, while ignoring "significant evidence during the closed period" [Doc. 24 p. 25].

Interacting and relating to others includes consideration of how well a child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of other's possessions. 20 C.F.R. § 416.926a(i). Examples of limited functioning in this domain include when the child has no friends or age appropriate friends, avoids or withdraws from familiar people, experiences anxiety or fear over meeting new people or trying new experiences, has difficulty cooperating without others, has difficulty playing games or sports with rules, and has difficulty communicating with others (due to speaking intelligibly or not using appropriate nonverbal cues). *See* Soc. Sec. Rul. 09-5p, 2009 WL 396026, at *7 (Feb. 17, 2009).

The Court finds that the ALJ cited substantial evidence that demonstrates plaintiff was not markedly limited in this domain. Relying on evidence discussed with regard to the paragraph B criteria of Listing 112.03, the ALJ cited to the questionnaire from Ms. Allen who opined that plaintiff's language and speech disorder did not affect his ability to interact and relate to others, the questionnaire from Ms. Phillips who opined plaintiff did not have any problems in this domain, and treatment notes ranging from October 2010, through September 2013, which indicated plaintiff had friends, was doing well in school, and had improved his grades [Tr. 148, 154, 462, 626, 925–28, 931]. Moreover, the ALJ observed that Ms. Weisgarber related in October 2011, that plaintiff did not have behavior problems at school but was argumentative at home when he did not get his way, and treatment notes from May, July, and September 2013, reveal that plaintiff had been off his

11

medication and was doing well with no reported symptoms of mood instability, aggression, hyperactivity, or attention-deficit/hyperactivity disorder ("ADHD") [Tr. 462, 626–27, 855, 860, 877, 879].

Plaintiff cites to medical records dated March 2008, through May 2010, that purport to contradict the ALJ's finding [Doc. 24 pp. 25–27]. Plaintiff asserts that this evidence was ignored by the ALJ in lieu of evidence that showed improvement toward the end of the close period [*Id.*]. Problematic for plaintiff, however, is that these records have little, if any, impact on the disability decision, as they pre-date plaintiff's closed period. *See Casey*, 987 F.2d at 1233. And contrary to plaintiff's assertion, the ALJ did not focus on, or place any special emphasis on, plaintiff's progress toward the end of the closed period. Rather, the ALJ cited to evidence that ranged throughout the entire closed period, providing an overview of plaintiff's functioning during the relevant time period under review.

The only evidence cited by plaintiff that occurred during the closed period included Ms. Weisgarber's August 2010, report that plaintiff continued to bully his siblings, her November 2010, report that plaintiff had difficulty expressing himself in certain situations due to anxiety and coping skills, and her March 2012, report that plaintiff was irritable at home toward his siblings [Doc. 24 p. 27 (citing Tr. 35, 168, 387, 907)]. In addition, plaintiff cites to a December 2012, treatment note from Dr. Greeson, which states plaintiff was experiencing agitation at home [*Id.* (citing Tr. 912)]. The ALJ's decision, however, need not be supported by all of the evidence, only substantial evidence. *See Blakley*, 581 F.3d at 406 (holding that "[t]he substantial-evidence standard . . . presupposes that there is

a zone of choice within which the decisionmakers can go either way"). Moreover, this evidence, coupled with the evidence cited by the ALJ, demonstrates intermittent behavioral issues, falling short of the requisite "marked" or "extreme" functional limitations necessary for plaintiff's impairments to functionally equal a listing. *See* 20 C.F.R. § 416.926a(b)(1) (recognizing "that limitations of any of the activities in the examples do not necessarily mean that a child has a 'marked' or 'extreme' limitation"). The Court further notes that contrary to plaintiff's assertion, the ALJ's decision nonetheless considered the pre-dated evidence cited by plaintiff [Tr. 617–29]. Accordingly, the Court finds that substantial evidence supports the ALJ's finding that plaintiff experienced less than marked limitations interacting and relating to others during the closed period.

### 2. Caring for Himself

Plaintiff similarly argues that the ALJ ignored substantial evidence that supports a finding that plaintiff suffers from marked or extreme limitations in the domain of caring for himself and instead focused on periods of improvement toward the end of the closed period [Doc. 24 pp. 28–31].

This domain requires consideration of how well the child maintains a healthy emotional and physical state, such as how well the child gets his or her physical and emotional wants and needs met in appropriate ways, how the child copes with stress and changes in his or her environment, and whether the child takes care of his or her own health, possessions, and living area. 20 C.F.R. § 416.926a(k). Examples of limited functioning in this domain include when a child uses self-soothing activities that show developmental

regression, has restrictive or stereotype mannerisms, does not spontaneously pursue enjoyable activities, engages in self-injurious behavior, does not dress or bathe himself appropriately considering the child's age, has disturbance in eating or sleeping patterns, or places inedible objects in mouth. Soc. Sec. Rul. 09-7p, 2009 WL 396029, at *6 (Feb. 17, 2009).

The Court likewise finds that substantial evidence supports the ALJ's conclusion that plaintiff has less than marked limitations in the domain of caring for himself. The ALJ acknowledged that plaintiff exhibited suicidal ideation and had difficulty sleeping but that the record established improvement with treatment during the closed period [Tr. 628]. For example, following an incident in May 2010, when plaintiff jumped out of a window, plaintiff exhibited improvement after starting new medication in July 2010 [Tr. 323, 523, 628]. Plaintiff demonstrated better clarity and few psychotic symptoms [*Id.*]. Plaintiff's mood, behavior, and overall functioning continued to improve [Tr. 628]. Ms. Phillips also indicated in her questionnaire that plaintiff had only a slight problem handling frustration and knowing when to ask for help [Tr. 156, 628]. Ms. Weisgarber further indicated that plaintiff cared for his personal hygiene needs but sometimes had to be reminded [Tr. 172, 628]. And while Ms. Weisgarber reported an incident in April 2010, where plaintiff had gotten angry and wrapped a cord around his neck, she believed plaintiff was being manipulative, and plaintiff denied any suicidal ideation [Tr. 628, 905]. The ALJ also cited to treatment records, ranging from May through September 2013, in which plaintiff had been off his medication and was doing well, performing well in school, and denying

symptoms of mood instability, aggression, hyperactivity, and ADHD [Tr. 628–29, 877–80].

As before, the Court finds no merit in plaintiff's contention that the ALJ selectively focused on plaintiff's improvement toward the end of the closed period. The evidence cited by the ALJ clearly refutes this proposition. In addition, plaintiff cites evidence that pre-dates the closed period [Doc. 24 pp. 28–31], which this Court has repeatedly found to be of little probative value, as plaintiff must show that he was disabled during the closed period. In fact, plaintiff does not cite to any specific evidence within the closed period that undermines the ALJ's decision. In the absence of reversible error shown by plaintiff, the Court must affirm the ALJ's decision if it is supported by substantial evidence. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion reached."). Having found that the ALJ's conclusion that plaintiff has less than marked limitations in his ability to care for himself is supported by substantial evidence, the Court will affirm this aspect of the ALJ's decision.

## C.    Opinion Evidence

Last, plaintiff submits that the ALJ failed to properly weigh the opinion evidence of record, ignoring the well-supported opinions of plaintiff's treating sources, Dr. Greeson and Dr. Reno, and instead assigning great weight to medical opinions from non-examining state agency medical consultants and opinions from "other sources." The Court will address the more specific assignments of error as to each source.

### 1. Gordon Greeson, M.D.

Dr. Greeson has been plaintiff's treating physician since 2009 [Tr. 217, 622]. When plaintiff first came under Dr. Greeson's care, plaintiff was experiencing hallucinations, insomnia, night terrors, anxiety, and excessive talking [Tr. 410, 573–91]. Plaintiff's medication was changed throughout treatment, with little success [*Id.*]. In February 2010, Dr. Greeson assigned [Tr. 410, 622] plaintiff a global assessment of function ("GAF") score—a "clinician's judgment of the individuals' overall level of functioning"—of 42, indicating serious symptoms or a serious impairment in functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32, 34 (4th ed. 2000). Dr. Greeson suspected that plaintiff may suffer from Asperger's disease and/or autism, and Dr. Greeson referred plaintiff to Dr. Reno for diagnostic clarification [Tr. 336, 410]. In June 2010, Dr. Greeson assigned a GAF score of 46, again indicating serious symptoms [Tr. 395, 622].

On November 3, 2011, Dr. Greeson wrote a letter on behalf of plaintiff with regard to the first administrative hearing held by the ALJ [Tr. 217, 622]. Dr. Greeson stated that plaintiff "has made a lot of progress" since he first began treatment in 2009, but Dr. Greeson requested that plaintiff be excused from testifying because "such a stressful situation . . . may be enough to cause severe regression and could be emotionally too taxing" on plaintiff [*Id.*]. Dr. Greeson continued to treat plaintiff in 2012 and 2013. While Ms. Weisgarber reported instances in which plaintiff was argumentative and irritable, plaintiff also showed improvement with his anxiety, nightmares, and was performing better

in school [Tr. 618, 894–95, 903–08]. Beginning in May 2013, plaintiff was able to discontinue his medication [Tr. 618, 622, 877–80].

The ALJ's decision discussed plaintiff's foregoing treatment history with Dr. Greeson [Tr. 618, 621–22]. In assessing Dr. Greeson's treatment of plaintiff, the ALJ observed that plaintiff experienced significant improvement beginning in July 2010, when plaintiff's medication was changed [Tr. 622]. The ALJ cited to plaintiff's GAF scores of 42 and 46, which were given prior to the closed period, but observed that plaintiff's behavior improved as noted in: (1) a follow-up appointment with Dr. Reno in July 2010, (2) Dr. Greeson's November 2011, letter that indicated plaintiff had made "a lot of progress," (3) treatment records from plaintiff's primary care physician, Christopher Miller, M.D., who noted that plaintiff exhibited improvement with medication, and (4) treatment records from 2012 and 2013 that likewise indicated improvement, despite instances in which plaintiff exhibited irritability and was argumentative at home [Tr. 323, 601, 622]. For these reasons, the ALJ gave "little weight" to Dr. Greeson's GAF scores [*Id.*].

Under the Social Security Act and its implementing regulations, if a treating physician's opinion as to the nature and severity of an impairment is (1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) is not inconsistent with the other substantial evidence in the case record, it must be given "controlling weight." 20 C.F.R. § 404.1527(c)(2). When an opinion does not garner controlling weight, the appropriate weight to be given to an opinion will be determined

based upon the length of treatment, frequency of examination, nature and extent of the treatment relationship, amount of relevant evidence that supports the opinion, the opinion's consistency with the record as a whole, the specialization of the source, and other factors that tend to support or contradict the opinion. *Id.*

When an ALJ does not give a treating physician's opinion controlling weight, the ALJ must give "good reasons" for the weight given to a treating source's opinion in the decision. *Id.* A decision denying benefits must "contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Nonetheless, the ultimate decision of disability rests with the ALJ. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Sullenger v. Comm'r of Soc. Sec.*, 255 Fed. App'x 988, 992 (6th Cir. 2007).

Plaintiff asserts that the ALJ selectively mentioned portions of Dr. Greeson's records that indicated periods of improvement [Doc. 24 p. 33]. For example, plaintiff cites to a June 15, 2010, treatment record, in which Dr. Greeson assessed a GAF score of 46 despite noting that plaintiff's medicines seemed to be working [*Id.* (citing Tr. 395)]. Plaintiff complains that "the ALJ never weighed Dr. Greeson's well supported record based on a long treating relationship with" plaintiff, which extends back to 2009 [*Id.* at 34]. The Court disagrees.

In reaching this conclusion, the Court observes that the ALJ properly noted that Dr. Greeson was plaintiff's treating physician and discussed much of their treating relationship, both prior and during the closed period. The ALJ was not obligated to assign greater weight to the GAF scores noted in the ALJ's decision or cited by plaintiff. The scores were assigned prior to the closed period, and the ALJ cited to substantial evidence that demonstrated that the GAF scores were not reflective of plaintiff's overall functioning during the closed period. *See Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data."). Indeed, Dr. Greeson's November 2011, letter and treatment records throughout 2012 and 2013, as well treatment records from Dr. Miller and Dr. Reno, indicate that plaintiff had made significant progress. The ALJ's observation in this regard demonstrates deference and consideration of Dr. Greeson's finding that plaintiff "has made a lot of progress."

Though plaintiff would interpret the evidence differently and have the ALJ reach an opposition conclusion, the Court finds the ALJ's determination is not only within the ALJ's "zone of choices" but is "supported by evidence in the case record" and is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5. Therefore, the Court finds no merit in plaintiff's contention that the ALJ did not properly consider the entirety of plaintiff's treating relationship with Dr. Greeson.

## 2. Angela Reno, Psy. D.

Plaintiff was referred to Dr. Reno for the purpose of conducting a psychological evaluation [Tr. 293]. Dr. Reno rendered her findings in an opinion dated June 16, 2010, which was based on evaluations she performed on March 1, April 28, and May 19, 2010 [Tr. 293–300]. The evaluation procedures utilized by Dr. Reno included a review of plaintiff's records and documentation, behavior observations, clinical interviews with plaintiff and Ms. Weisgarber, and various testing including the Theory of Mind Tasks, the Differential Ability Scales-Second Education, the Behavior Assessments System for Children-Second Edition, the Adaptive Behavior Assessment System-Second Edition, and the Rorschach Inkblot Test [Tr. 323]. Dr. Reno concluded that plaintiff suffered from written expression learning disability and psychotic disorder, not otherwise specific [Tr. 298].

Dr. Reno surmised that although plaintiff exhibited excellent verbal and expressive language abilities, he had difficulty with attention, impulsivity, and distractibility when completing tasks and exhibited a marked difference between his spatial abilities and verbal abilities, which was likely impacted by ADHD-type symptomatology and unusual thought processes and processing styles [Tr. 293, 299]. In clinical measures, plaintiff showed marked impairment, endorsing serious psychiatric symptomatology such as hallucinations, impaired sleep patterns, and blurring the lines between reality and fantasy [*Id.*]. Dr. Reno's recommendations included continued medication, management of psychiatric symptomatology, outpatient therapy that focused on improving behavior and coping skills,

school modifications to assist with written expression deficits, and case management services [Tr. 293, 299–300].

After Dr. Reno rendered her opinion, she conducted one follow-up appointment on July 14, 2010 [Tr. 323–24]. The appointment, in relevant part, focused on plaintiff's improvement as the result of new medications [Tr. 323]. Specifically, Dr. Reno observed that plaintiff had "much improved on Abilify" and demonstrated "better clarity, few psychotic [symptoms], better mood and beh[avior], and improved over-all functioning" [*Id.*]. Dr. Reno "had no plans for more sessions" but noted that she would refer plaintiff to another therapist [*Id.*]. Upon examination, plaintiff had a cooperative attitude, was calmer than previous sessions, exhibited mild articulation errors in his speech, and appeared euthymic [*Id.*].

The ALJ discussed Dr. Reno's findings and opinion throughout the disability decision [Tr. 617–18, 621, 625]. The ALJ assigned great weight to Dr. Reno's opinion with regard to plaintiff's diagnosis of psychotic disorder, not otherwise specified, but assigned little weight to the opinion to the extent that it suggested plaintiff had marked impairments [Tr. 621]. The ALJ explained that the July 14, 2010, follow-up appointment with Dr. Reno demonstrated that plaintiff had improved with medication and experienced few psychotic symptoms, with overall improvement in functioning, mood, and behavior [*Id.*]. Dr. Reno's observation in this regard, the ALJ found, was consistent with subsequent record evidence discussed throughout the ALJ's decision, which demonstrated continued improvement with medication [*Id.*]. The ALJ cited to treatment records from 2011 and

21

2012 that indicated plaintiff continued to improve with treatment and do well in school, and that by May 2013 through the end of the closed period, plaintiff was able to discontinue his medication [*Id.*].

As an initial matter, the Court addresses plaintiff's suggestion that Dr. Reno was a "treating source" [*See* Doc. 24 p. 31].  This is significant because the level of deference an opinion is afforded greatly differs under agency regulations and rulings based on the source of the opinion.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (observing that the pertinent regulations "recognize[] that not all medical sources need be treated equally, classifying acceptable medical sources into three types: non-examining sources, non-treating (but examining) sources, and treating sources").  This Court previously ruled in the first appeal that Dr. Reno was not a treating source but rather a non-treating, examining source, because she met with plaintiff for the limited purpose of conducting a psychological evaluation in order to assist Dr. Greeson with diagnostic clarification [Tr. 702–03]; *see* 20 C.F.R. § 416.902 (defining a "treating source" as an acceptable medical source who provides, or has provided, medical treatment or evaluation on an ongoing basis and a "non-treating source" as an acceptable medical source who examined a claimant but does not, or did not, have an ongoing treatment relationship).  Accordingly, and to the extent that plaintiff argues that Dr. Reno's opinion was due the same deference as a treating source, the Court finds that its prior determination remains accurate.

Opinions from non-treating, examining sources are never assessed for controlling weight, and the "good reason" requirement enumerated in 20 C.F.R. 416.927(c)(2) only applies "to a treating-source opinion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability." *Id.* (citing 20 C.F.R. § 404.1527(c)). "Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id.* (quoting 20 C.F.R. § 404.1527(c)(6)).

Turning to plaintiff's contention that substantial evidence does not support the ALJ's assessment of Dr. Reno's opinion, plaintiff complains that the ALJ selectively focused on plaintiff's noted improvement during Dr. Reno's July 14, 2010, follow-up appointment and later treatment records from 2013, while ignoring "Dr. Reno's thorough testing and her diagnosis of Psychosis Disorder, Not Otherwise Specific [that] shows a very different picture of [plaintiff]" [Doc. 24 p. 33]. To the contrary, the ALJ dutifully examined and discussed Dr. Reno's opinion and evaluation findings in sufficient detail, properly observing that subsequent treatment, largely through medication changes, positively affected many of the marked and concerning behaviors plaintiff exhibited during his evaluation period with Dr. Reno. These positive behavioral changes, as cited by the ALJ, were noted throughout the entire close period. It is well established that "an impairment that can be remedied by treatment will not serve as a basis for a finding of

disability." *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967). Thus, the Court finds that substantial evidence supports the ALJ's assessment of Dr. Reno's opinion.

### 3. Non-Examining State Agency Medical Consultants

The record includes two separate Childhood Disability Evaluation Form opinions from state agency medical consultants [Tr. 438–43, 480–85]. Each form opinion is completed by a "consultant with overall responsibility" and, in some cases, an "additional consultant" [*Id.*]; *Explaining Title XVI Childhood Disability Evaluation Determinations*, Program Operation Manual System ("POMS") § DI. 25230.001.7.a., http://policy.ssa.gov/poms.nsf/lnx/0425230001 (last updated Aug. 27, 2015). The Childhood Disability Evaluation Form serves to memorialize the agency's determination, at either the initial or reconsideration level, of whether a child is disabled. *How We Will Explain Our Findings*, POMS § DI. 25201.015.001, http://policy.ssa.gov/poms.nsf/lnx/0425201015 (last updated Dec. 2, 2014). In relevant part, the consultants must assess whether a claimant functionally equals an impairment by evaluating a child's functioning in all six domains, specifically indicating by check-mark boxes whether a claimant has "no limitation" or "less than marked," "marked," or "extreme" limitations in each domain of functioning [Tr. 440–41, 482–83].

The first Childhood Disability Evaluation Form was completed in September 2010, by Glenda D. Knox-Carter, M.D., and Alieen H. McAlister, M.D. [Tr. 439–43]. Therein, the doctors opined plaintiff had no limitations acquiring or using information and less than marked limitations attending and completing tasks, interacting and relating to others, and

caring for himself [Tr. 440–41].  No boxes were checked for the domains of moving about and manipulating objects or health and physical well-being [Tr. 441].  Dr. McAlister signed the form opinion as the "additional consultant" on September 8, 2010, while Dr. Knox-Carter signed as the "consultant with the overall responsibility" on September 27, 2010 [Tr. 439].

The second Childhood Disability Evaluation Form was completed in December 2010, by Louise G. Patikas, M.D., and Rebecca J. Joslin, Ed.D.  [Tr. 480–85].  This second opinion expressed identical findings, except that the domains of moving about and manipulating objects, and health and physical well-being were completed [Tr. 483].  No limitation was assessed with regard to moving about and manipulating objects and less than marked was assessed with regard to health and physical well-being [*Id.*].  Dr. Joslin signed the form opinion as the "additional consultant" on December 10, 2010, while Dr. Patikas signed as the "consultant with overall responsibility" on December 28, 2010 [Tr. 481].

The ALJ considered both form opinions in her decision, assigning "great weight" to the opinions because they were "consistent with the evidence of record indicating that the claimant's behavior and symptoms improved with treatment" [Tr. 623].

Plaintiff complains that the ALJ erroneously scrutinized the opinions offered by Dr. Greeson and Dr. Reno more than the opinions offered by the state agency medical consultants [Doc. 24 pp. 34–35].  Additionally, plaintiff attacks the credibility of both form opinions.  Plaintiff argues that: (1) the September 2010, form opinion was not completely filled out, (2) neither form opinion indicates which doctor analyzed which domain, (3) the

dates of signature differ between the consultant with the overall responsibility and the additional consultant, (4) it is unclear what evidence the doctors considered, and (5) no explanation was given for any of the boxes checked [*Id.*].

The POMS clarifies that the "consultant with overall responsibility," as the title suggests, "has [the] overall responsibility for the content of the form and must sign the form to attest that it is complete and that he or she is responsible for its content, including the findings of fact and any discussion of supporting evidence." *Explaining Title XVI Childhood Disability Evaluation Determinations*, Program Operation Manual System ("POMS") § DI. 25230.001.7.a., http://policy.ssa.gov/poms.nsf/lnx/0425230001 (last updated Aug. 27, 2015). Thus, Dr. Knox-Carter and Dr. Patikas, whose names appear on the "consultant with the overall responsibility" signature line, were responsible for the findings expressed in the form opinions, while Dr. McAlister and Dr. Joslin simply provided input on the findings made therein. Plaintiff provides no explanation as to why the supportability or credibility of the opinions is undermined simply because the signature date of the consultants with overall responsibility differs from the signature date of the additional consultants.

Moreover, each form opinion provides a section entitled, "Explanation of Findings," in which the consultants list the evidenced considered in making their findings [Tr. 443, 485]. Additionally, both form opinions are accompanied with a Development Summary Worksheet [Tr. 444–48, 486–89], which, in relevant part, "[r]ecord the receipt or non-receipt of requested evidence." *Documenting the Disability Folder—Disability*

*Determination Services (DDS)*, POMS § DI. 20503.001.E.1., http://policy.ssa.gov/poms.nsf/lnx/0420503001 (last updated Mar. 30, 2017). The evidence considered by the state agency medical consultants included, among other evidence, Dr. Reno's and Dr. Greeson's treatment records, mental health records, and plaintiff's education records, including the questionnaires completed by Ms. Philips and Ms. Allen [Tr. 443–46, 485–87].

Finally, the Court is cognizant that the first form opinion is incomplete in that Dr. Knox-Carter and Dr. McAlister did not rate plaintiff's level of functioning in the domains of moving about and manipulating objects, and health and physical wellbeing. In addition, the Court observes that the ALJ's analysis of the state agency medical consultants' opinions was brief. *See Gayheart*, 710 F.3d at 379 ("A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires.").

The Court finds, however, that any error committed by the ALJ in weighing the state agency medical consultants' opinions was harmless. An ALJ's error is harmless if his ultimate decision was supported by substantial evidence, and the error did not deprive the claimant of an important benefit or safeguard. *Wilson*, 378 F.3d at 546–47. Because the ALJ's decision demonstrates that she considered all of the evidence of record and provided a reasoned explanation, supported by substantial evidence apart from the state agency medical consultants' opinions, the Court finds that remanding the case would serve no useful purpose. *See Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 463 (6th Cir. 2005)

("[W]e continue to believe that [w]hen remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game." (internal quotations omitted)).

### 4. Other Sources

Plaintiff also challenges the ALJ's treatment of "other source" evidence, including opinions from Shawn Foster, LCSW, Ms. Allen, plaintiff's speech therapist, and Melanie Kirby and Brian Jones, plaintiff's teachers.

Ms. Foster completed a medical source statement in March 2015, wherein she opined that plaintiff had no limits and that she had not seen plaintiff since March 9, 2015, because plaintiff was doing well at home and in school [Tr. 944–46]. The ALJ gave great weight to Ms. Foster's opinion "because it is consistent with the evidence of record showing that the claimant improved with treatment" [*Id.*].

As previously discussed, plaintiff's speech therapist, Ms. Allen, completed a questionnaire on August 23, 2010. The ALJ gave the questionnaire great weight, noting that Ms. Allen had opined plaintiff's language and speech disorder did not affect his ability to interact and relate to others, but plaintiff did have occasional difficulty organizing his thoughts through writing [Tr. 622].

Ms. Kirby and Mr. Jones each completed a Child Function Questionnaire in January 2015. Ms. Kirby indicated that plaintiff did not have more than moderate limitations, that he was a great math student and understood concepts quicker than his peers, that he was friendly and initiated conversations, and that he was sometimes districted [Tr. 773–79].

Mr. Jones likewise indicated no more than moderate limitations, observing that plaintiff: (1) played a huge role in classroom discussions, (2) had very interesting and sophisticated ideas, (3) was polite and respectful, and (4) had difficulty writing down ideas and staying on tasks, like other eighth-grade boys [Tr. 781–87]. The ALJ assigned great weight to both questionnaires, finding them consistent with the evidence of record that plaintiff's behavior and symptoms improved with treatment [Tr. 623].

Under the regulations, "other sources" include medical sources who are non-acceptable medical sources—for instance, unlicensed physicians or psychologists—as well as educational personnel, such as teachers. 20 C.F.R. § 416.913(a)–(d). An "opinion of a 'non-acceptable medical source' is not entitled to any particular weight or deference—the ALJ has discretion to assign it any weight he feels appropriate based on the evidence of record." *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 248–49 (6th Cir. 2015) (recognizing that a physical therapist was a "non-acceptable medical source," and therefore, "the ALJ was not required to give her opinion any particular weight" (citations omitted)). Instead, "other source" opinions are assessed pursuant to Social Security Ruling 06-03p, which requires that the ALJ consider an "other source" opinion and should generally explain the weight given to the opinions. *See* Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006).

Plaintiff argues that the ALJ provided no reasoning why any of the foregoing opinions were entitled to great weight and that the teacher questionnaires were completed more than a year after plaintiff acknowledged improvement [Doc. 24 p. 25].

First, as to Ms. Allen's opinion, the Court finds that the ALJ properly considered the opinion. Although the ALJ did not provide any specific reason for the assignment of weight in the portion of the decision that assigned Ms. Allen's opinion great deference, the Court observes that throughout the disability decision, the ALJ discussed Ms. Allen's opinion, finding it consistent with other record evidence that demonstrated plaintiff did not have an impairment of listing level severity or of functional equivalence [Tr. 619, 626]. Thus, the ALJ's decision makes clear that great weight was assigned to the opinion because the ALJ found it supported by and consistent with other substantial evidence.

Second, as to the medical source statement completed by Ms. Foster in March 2015, and the questionnaires completed by Ms. Kirby and Mr. Jones in January 2015, the Court observes that, while the ALJ is required to consider all of the evidence in the case record, Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *6, evidence post-dating the period under review is generally of little probative value, unless the evidence relates back to the claimant's condition during the relevant time period. *Strong v. Comm'r of Soc. Sec.*, 88 F. App'x 841, 845 (6th Cir. 2004). Here, the foregoing opinions were rendered well beyond plaintiff's closed period, which ended on September 17, 2013, and there is nothing in the record that indicates that the medical source statement or questionnaires are reflective of plaintiff's functioning prior to September 17, 2013. Therefore, the Court finds these opinions do not constitute substantial evidence that plaintiff is not disabled as they do not relate back to the closed period.

Nonetheless, the Court finds that the ALJ's conclusion that plaintiff is not disabled is supported by substantial evidence. The medical source statement and questionnaires were only three opinions among the many medical and non-medical opinions the ALJ considered and weighed. Moreover, apart from assigning the medical sources statement and questionnaires a specific weight, the ALJ did not rely on these opinions in any other part of the disability decision, including whether plaintiff's impairments met, equaled, or functionally equaled a listed impairment. Therefore, the Court finds that the ALJ's ultimate decision denying plaintiff benefits is supported by substantial evidence.

## IV.     Conclusion

Based on the foregoing, plaintiff's Motion for Summary Judgement [Doc. 23] will be **DENIED**, and the Commissioner's Motion for Summary Judgment [Doc. 28] will be **GRANTED**. The decision of the Commissioner will be **AFFIRMED**. The Clerk of Court will be directed to **CLOSE** this case.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE